UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br>JOEL RALPH TURNBOW, *et al.*,<br><br>Defendants. | Case No. 3:18-cr-00001-MMD-WGC<br><br>ORDER |

**I.    SUMMARY**

Joel Ralph Turnbow was charged with felon in possession of a firearm, possession with intent to distribute methamphetamine, and conspiracy to possess with intent to distribute methamphetamine—based on drugs and a gun found in a backpack in the trunk of a car he was driving when he was arrested on a misdemeanor arrest warrant, following an inventory search of the car. Before the Court is Defendant Turnbow's motion to suppress the drugs and the gun as the unconstitutional fruit of a warrantless search ("Motion") (ECF No. 48),[1] and Defendant Tracy Method's motion for joinder to the Motion (ECF No. 49).[2] The Court held an evidentiary hearing on these motions on February 12, 2018 (the "Hearing"), and considers the arguments raised and exhibits admitted therein. (ECF No. 63.) Because the inventory search was unconstitutional, and for the reasons discussed below, the Court will grant the Motion.

///

---

[1] The government filed a response to the Motion (ECF No. 50), and Turnbow filed a reply (ECF No. 51).

[2] Defendant Method moved to join Turnbow's Motion. For the reasons stated on the record, the Court granted Method's motion to join Turnbow's Motion (ECF No. 49) at the Hearing (ECF No. 63).

## II. FACTUAL FINDINGS

The Court relies on evidence attached to the parties' briefs, as well as the testimony presented at the Hearing, to make its findings of fact. The Court points out any inconsistencies between the evidence before the Court where such inconsistencies are material to the Court's findings of fact.

Defendant Joel Turnbow was driving a brown Honda (the "Car") down Galleron Way in Sparks, Nevada, on November 21, 2017. (ECF No 50-4 at 10.) Defendant Tracy Method was riding in the front seat. (*Id.*) At approximately 1:46 p.m., Sparks Police Department ("SPD") Sergeant English noticed them as they stopped at the intersection of Galleron Way and West 4th Street. (*Id.*) He was in a marked police car. (*Id.*) Sergeant English saw the female passenger—Method—look at him and then quickly look away. (*Id.*) Apparently, this raised Sergeant English's suspicion, which was already heightened because he believed the Car might be part of a "crime trend" where Honda passenger cars were being stolen. (*Id.*)

Sergeant English let the Car pass and ran its license plates. (*Id.*) That search returned clear. (*Id.*) Nonetheless, having seen that the car was registered to Turnbow and Method, he ran a search on their names, and that search revealed that Turnbow had an outstanding misdemeanor arrest warrant from the Reno Municipal Court. (*Id.*) Sergeant English began to follow them in his police car. (*Id.*)

Turnbow pulled up to a 7-11 at 425 Greenbrae Drive, and got out of the Car. (*Id.*) At this point, Sergeant English had found a 2013 booking photo of Turnbow. (*Id.*) The booking photo appeared to match the man getting out of the car at the 7-11. (*Id.*) Turnbow got back in the Car and began to drive away, headed west on Greenbrae Drive. (*Id.*) When he turned right onto Pyramid Way, Sergeant English decided to pull Turnbow over. (*Id.*) After Sergeant English turned on his lights and sirens, Turnbow pulled over into the parking lot of a smoke shop. (*Id.*) As Sergeant English was pulling the Car over, he saw Method "moving a lot," and appear to put something in the backseat of the Car. (*Id.*)

///

Sergeant English approached the driver and obtained Turnbow's Nevada ID. Turnbow provided Sergeant English with a valid registration for the Car. (ECF No. 50-4 at 10.) But Turnbow and Method were unable to produce valid proof of insurance for the Car.[3] (*Id.*) Sergeant English reported that Turnbow was "sweating more than normal for the current temperature." (*Id.*) Sergeant English called SPD dispatch, who confirmed Turnbow's pending arrest warrant, and that his driver's license was suspended.[4] (*Id.*) SPD dispatch also told Sergeant English that Method was a registered ex-felon for trafficking in controlled substances, and that her driver's license was also suspended. (*Id.*) Sergeant English arrested Turnbow because of the warrant. (*Id.*) Sergeant English searched Turnbow incident to his arrest and observed that he had "a large amount of cash on him in $100 and $20 bills." (*Id.*) Sergeant English testified at the Hearing that he decided to impound the Car at this time—because he had arrested Turnbow, and Method did not have a valid driver's license.

By this time, a cover officer Sergeant English had already called for—his supervisor, Lieutenant McCreary—had arrived. Sergeant English explained his concerns regarding Method's "suspicious activity" to him, and asked Lieutenant McCreary to call for a K-9 unit. (*Id.*) Sargent English testified at the hearing he wanted a K-9 unit on-scene to establish probable cause for a search that would allow him to more thoroughly search

---

[3] It is undisputed that Turnbow and Method did not produce valid proof of insurance during the traffic stop. The government offered testimony from the Custodian of Records for the Nevada Department of Motor Vehicles ("DMV") at the Hearing to show that on the date of the stop, DMV records reflect that Turnbow and Method had not submitted proof of insurance. (ECF Nos. 50-1, 50-2.) However, DMV records reflect that such proof was offered on December 18, 2017, showing evidence of insurance going back to at least March 23 of that year. (ECF No. 50-1 at 3; ECF No. 50-2 at 3.)

[4] The parties presented evidence and argument at the Hearing as to whether Turnbow and Method's driver's licenses were suspended at the time of the stop. Testimony at the Hearing established beyond dispute that SPD dispatch told Sergeant English that both of their licenses were suspended when he called in during the stop. Thus, Sergeant English reasonably believed their licenses were suspended at the time of the stop. In any event, the status of Turnbow and Method's licenses is not material to the Court's findings herein.

the Car than would be permissible pursuant to an inventory search. Lieutenant McCreary, in turn, called a K-9 officer, Officer Radley, who arrived on scene with his narcotic-sniffing dog, Rox. (ECF No. 51-1 at 2.[5]) Officer Radley walked Rox around the Car, and while Rox "showed a lot of interest in the rear of the vehicle under the trunk area," Rox did not alert to the presence of any narcotics he was trained to detect. (*Id.*) Officer Radley further testified at the Hearing that he also led Rox into the Car because one of the doors was open, but Rox did not alert when Rox was inside the Car.

Sergeant English told Method he was going to impound the Car because she had an invalid license. (ECF No. 50-4 at 10-11.) She asked him if she should call someone to give her a ride, and he "told her she should so she did not have to walk back to Sun Valley."[6] (*Id.* at 11.) Sergeant English asked her if she had any property in the car that she would like before he impounded the car. (*Id.*) She told Sergeant English that she would like her purse, which was in the front seat. (*Id.*) He got her purse from the front seat, and asked for her consent to search it. She consented. The search of the purse yielded "a large sum of money in $20 bills." (*Id.*) Sergeant English then gave Method her purse back, and she left the traffic stop on foot. (*Id.*)

The officers then began the process of impounding the Car. (*Id.*) Pursuant to the SPD Vehicle Inventory and Tow policy (ECF No. 50-3) (the "Policy"), they conducted an inventory search of the Car before having it towed. (ECF No. 50-4 at 11.) However, while the Policy provides they must prepare a written Vehicle Inventory Report, no such document was provided to the Court. During the inventory search, Sergeant English found a brown and black backpack in the Car's trunk. (*Id.*) The backpack contained a black Taurus semiautomatic model 709 9mm pistol, bearing serial number TJZ21917, with a

---

[5]The Court denied Turnbow's request to admit Officer Radley's report at the Hearing. However, the Court will consider the report to supplement the background facts because the parties ultimately did question Officer Radley about the content of his report, which was attached to Defendant's reply brief.

[6]Sun Valley is an area about five miles northwest of the stop location. *See* Google Maps, *Reno-Sparks Indian Colony Smoke Shop to Sun Valley* (last accessed Feb. 14, 2019), https://goo.gl/maps/RrJ3hhB1Eeq.

loaded magazine and two additional magazines. (*Id.*) Under the backpack, they found a large, blue bag containing multiple baggies of marijuana, multiple containers of burnt marijuana cigarettes, multiple baggies of a crystal-like substance that appeared to be methamphetamine, and drug paraphernalia, including packing material, a digital scale, small balloons, glass smoking pipes with burnt drug residue, and a baggie with 2 pills, along with several broken pipes, hypodermic devices, and a cooking spoon in a bag. (*Id.*) The inventory search also yielded a digital scale, which Officer Radley found in the Car's front passenger compartment. (*Id.*) Officer Radley noted that the Car also contained "paperwork that had an address which Sgt. ENGLISH had seen the subjects leaving just prior to being stopped."[7] (ECF No. 51-1 at 2.)

The officers then called a tow truck to take the Car to the impound lot about an hour after the stop. (ECF Nos. 50-4 at 11, 51-2 at 2-3.) As the tow truck driver was winching the Car onto the tow truck, he noticed a small black box that was magnetically attached to the underside of the Car, which had a pink hair elastic wrapped around it. (ECF No. 50-4 at 11.) The tow truck driver alerted the officers to this small box, which officers removed, opened, and inspected. (*Id.*) It contained substances that appeared to be methamphetamine and heroin, along with 9 pills that were later determined to be oxycodone. (*Id.*)

**III.    DISCUSSION**

Turnbow presents three distinct arguments: (1) the vehicle stop was an unconstitutional seizure under the Fourth Amendment; (2) Sergeant English unlawfully

---

[7]Defendants raised this discrepancy between the police reports at the Hearing, arguing it showed that Sergeant English had been surveilling Turnbow and Method before the moment he wrote he encountered them in his police report. However, Officer Radley testified at the Hearing that his involvement in the stop was limited, and he may have added this detail to his report based on something somebody might have told him that he did not verify. He further testified he had no firsthand knowledge of where Sergeant English first encountered Turnbow and Method, and could not remember why he put this particular detail in his report. For his part, Sergeant English testified at the Hearing that he first encountered Turnbow and Method at the intersection of Galleron Way and West 4th Street, as he wrote in his report. Thus, the Court assigns no weight to this purported discrepancy and does not again discuss it herein.

extended the duration of the vehicle stop by requesting a K-9 unit; and (3) the inventory search was conducted in violation of the Fourth Amendment, warranting suppression of all of the evidence found in the Car. The Court finds that the vehicle stop on the arrest warrant was constitutional and not unlawfully prolonged. However, the Court finds that the government has failed to produce sufficient evidence to demonstrate that the inventory search of the vehicle was conducted in compliance with the Fourth Amendment. Therefore, the Court will grant Turnbow's Motion.

### A. Constitutionality of Traffic Stop

Turnbow first argues that the traffic stop was unlawful because Sergeant English lacked reasonable suspicion that any traffic or other violation had occurred warranting the traffic stop. (ECF No. 48 at 2-3.) The government counters that Sergeant English had reasonable suspicion to stop the Car because Turnbow was driving on a suspended license and had a pending warrant out for his arrest.[8] (ECF No. 50 at 4-5.) The Court finds that Sergeant English had at least reasonable suspicion to stop Turnbow on the pending arrest warrant.

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). But a court need not determine the reasonableness of a temporary detention if it determines that the officer had reasonable suspicion to conclude that a traffic violation occurred. *See U.S. v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996)). Further, an officer may stop a vehicle when a license plate check reveals an outstanding arrest warrant for the owner, and the driver of the car appears to match the physical description of the owner. *See United States v. Castro*, 379 F. App'x 549, 550-51 (9th Cir. 2010) (first

---

[8]There is no evidence that Sergeant English stopped the Car because of Turnbow's suspended license and the government did not pursue this argument at the Hearing.

citing *Arizona v. Johnson*, 555 U.S. 323 (2009), then citing *U.S. v. Crasper*, 472 F.3d 1141, 1147 (9th Cir. 2007)).

Here, Sergeant English permissibly stopped Turnbow because he had learned there was a warrant out for Turnbow's arrest, and had confirmed that Turnbow's appearance matched the physical descriptors on the arrest warrant. *See Castro*, 379 F. App'x at 550-51. The warrant for Turnbow's arrest was the but for cause of the stop. There was no constitutional issue with the stop itself.

**B.     Whether Officer English Unlawfully Prolonged the Traffic Stop**

Turnbow also argues that Sergeant English unlawfully prolonged the traffic stop by calling for a K-9 unit to conduct a dog sniff of the Car. (ECF No. 48 at 13-14.) The government counters that Sergeant English did not unlawfully prolong the traffic stop because there was no traffic stop at all—he pulled Turnbow over because of the arrest warrant, and then arrested Turnbow as soon as he confirmed that warrant.[9] (ECF No. 50 at 7-8.) The Court again agrees with the government. Sergeant English pulled Turnbow over at least in part because of the arrest warrant and arrested him as soon as he confirmed the warrant with SPD dispatch. These circumstances fall squarely outside the line of cases Turnbow seeks to rely on including *Rodriguez v. U.S.*, 135 S. Ct. 1609 (2015) and *U.S. v. Landeros*, 913 F.3d 862 (9th Cir. 2019), where officers prolonged traffic stops to search for evidence of crimes unrelated to the mission of those traffic stops without reasonable suspicion. Indeed, arresting Turnbow was fully within the "mission" of this stop because Sergeant English pulled him over based on the arrest warrant. *See Landeros*, 913 F.3d at 868. In addition, the dog sniff did not occur until after Turnbow was arrested.[10] Thus, Sergeant English did not unlawfully extend the length of the warrant stop.

///

---

[9] The Court paraphrases the government's argument on this point as presented in its briefing, as supplemented by argument presented at the Hearing.

[10] Sergeant English provided unrebutted testimony to this effect at the Hearing.

### C. Validity of Inventory Search

Turnbow further argues, in relevant part, that the drugs and gun found in the trunk of the Car should be suppressed as the unconstitutional fruits of a warrantless search that do not fall within the inventory search exception to the warrant requirement. (ECF Nos. 48 at 9-13, 51 at 4-6.) Turnbow argues that the inventory search was merely a pretext to cover up a warrantless search of the Car designed to find incriminating evidence. (ECF No. 48 at 9-13, 51 at 6.) The government counters that the search of the Car falls within the inventory search exception to the warrant requirement because: (1) it was conducted pursuant to the Policy; and (2) impounding and inventory searching the Car served community caretaking purposes. (ECF No. 50 at 5-7.) The government proffers the following as the community caretaking purposes served by the search and impounding of the Car: (a) there was no licensed on-scene driver; (b) the Car was not lawfully parked; (c) Turnbow and Method were unable to produce valid proof of the Car's insurance; and (d) Sergeant English was concerned that the Car might be vandalized if left where it was, which might lead to liability for SPD.[11] (*Id.* at 6-7.) The government further argues that the Fourth Amendment does not require Sergeant English to have made alternative arrangements other than impound, even if they were possible. (*Id.* at 7.) Because the Court finds, as explained below, that the inventory search would not have occurred had Sergeant English not been searching for evidence of suspected drug activity, the Court agrees with Turnbow.

Warrantless searches are "per se unreasonable" under the Fourth Amendment and "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The "community caretaking" doctrine is one such exception. *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016). Under this doctrine, "police may, without a warrant, impound and search a motor vehicle so long as they do so in conformance with the standardized procedures of the local police department and in furtherance of a community caretaking purpose, such as promoting

---

[11] Sergeant English testified to this at the Hearing.

8

public safety or the efficient flow of traffic." *Id.* (citing *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012)); *see also United States v. Caseres*, 533 F.3d 1064, 1074 (9th Cir. 2008) ("Such warrantless inventory searches of vehicles are lawful only if conducted pursuant to standard police procedures that are aimed at protecting the owner's property and at protecting the police from the owner charging them with having stolen, lost, or damaged his property.") Even if an inventory search technically complies with the applicable policy, the Ninth Circuit has suggested that law enforcement officers should "sufficiently consider alternatives before impounding" a vehicle under the community caretaking doctrine. *See United States v. Maddox*, 614 F.3d 1046, 1050 (9th Cir. 2010) (applying the law of Washington State).

But the inventory search exception to the warrant requirement is subject to an important limiting principle—it cannot be used as pretextual cover to conduct warrantless searches for evidence of criminal activity. *See, e.g.*, *United States v. Hellman*, 556 F.2d 442, 443-44 (9th Cir. 1977). "The Supreme Court in allowing the impoundment and search of vehicles under the community caretaking doctrine has . . . allowed the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Miranda v. City of Cornelius*, 429 F.3d 858, 863 (9th Cir. 2005) (internal quotation marks and citations omitted). Said otherwise, to be a valid inventory search, "the purpose of the search must be non-investigative; it must be conducted on the basis of something other than suspicion of evidence of criminal activity." *U.S. v. Johnson*, 889 F.3d 1120, 1125 (9th Cir. 2018) (citing *Torres*, 828 F.3d at 1118) (internal quotation marks omitted). The officer's subjective intent is relevant to this inquiry. *See id.* at 1125-26.

While the government bears the burden of showing that a warrantless search or seizure falls within an exception to the warrant requirement, *see United States v. Huguez-Ibarra*, 954 F.2d 546, 551 (9th Cir. 1992), the defendant bears the burden of showing that the inventory search was unreasonably pretextual, *see Johnson*, 889 F.3d at 1126. "The search cannot be a ruse for a general rummaging in order to discover incriminating

evidence." *Johnson*, 889 F.3d at 1126 (internal citation and quotation marks omitted). Thus, the key question before the Court is whether Turnbow "has produced evidence that demonstrates the officers would not have searched and seized items from the car he was driving but for an impermissible motive." *Id.*

The Court finds that the government has not met its burden to show that the circumstances here falls within the inventory search exception to the warrant requirement under the community caretaking doctrine because the objective evidence compels a finding that the officers here would not have inventory searched the Car had Sergeant English not been looking for evidence of suspected drug activity. The Court analyzes the relevant evidence below.

To start, the government conceded at the Hearing that Sergeant English had a dual motive in conducting the inventory search of the Car—both looking for evidence of the drug activity he suspected Turnbow and Method were engaged in and protecting the contents of the Car while it was impounded. But the objective evidence shows that Sergeant English had more than a dual motive. He suspected—correctly, as it turns out—there were drugs in the Car, and set out to find them, and his exercise of discretion to impound the Car emanates from that suspicion.[12] Sergeant English both wrote in his police report and testified at the Hearing that he was prompted to run the Car's license plate when he first encountered it because Method looked suspicious, and Turnbow was driving the Car (a brown Honda, which was suspicious because an elevated number of Hondas had been stolen). He was sufficiently suspicious that he ran searches on both of their names even after the search he ran on the Car's license plates came back clear. Neither the stop, Turnbow's arrest, or the inventory search would have happened had

---

[12]The Court expects, and even hopes, that law enforcement officers will investigate suspicious activity, as their work keeps the public safe. The Court does not seek to impugn Sergeant English's motives here, and notes that his hunch about the Car was correct, showing accurate instincts. However, law enforcement investigations must operate within the reasonable boundaries imposed by the Fourth Amendment. As the Supreme Court has written in a related context, the Court's direction to Officer English as to what he could have done differently here is "simple—get a warrant." *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473, 2495 (2014).

Sergeant English not decided to dig deeper—leading him to find Turnbow's arrest warrant—because something about Turnbow and Method made him suspicious.

It becomes clearer that Sergeant English's true motivation was to search the Car for drugs as the chronology of relevant events unfolds. When he decided to pull the Car over, Sergeant English's suspicions that Turnbow and Method were involved in drug activity were further heightened because Method was "moving a lot and it appeared she had put something in the backseat area of the vehicle." (ECF No. 50-4 at 11.) Sergeant English testified at the Hearing that he explained these suspicions to his supervisor, Lieutenant McCreary, when he arrived on-scene. Sergeant English requested that Lieutenant McCreary call a K-9 unit for him, which Lieutenant McCreary did. K-9 units are used to find drugs. *See, e.g.*, *Florida v. Harris*, 568 U.S. 237 (2013). Calling a K-9 unit is not a typical part of an inventory search, nor does it serve a community caretaking purpose. In addition, Sergeant English asked for consent to search Method's purse, which he would not have done were he not looking for incriminating evidence in her purse.

When the Court asked Sergeant English at the Hearing why he requested a K-9 unit, he replied it was so he could establish probable cause to conduct a broader search of the Car than would be possible during an inventory search. This is explicit testimony that he was looking for drugs in the Car. Further, the K-9 officer—Officer Radley—testified at the Hearing that he ran his dog, Rox, both around and inside the Car because the front door was open. While Rox was interested in the trunk, he did not alert, so Sergeant English lacked probable cause to search the Car based on the dog sniff—as Sergeant English also stated at the Hearing. In addition, it was only after Rox failed to alert that Sergeant English started the inventory search. The Court infers from this that Sergeant English's intent from the beginning of the stop was to search the Car for drugs, and he only fell back on the inventory search exception to the warrant requirement once it became clear that his first choice—probable cause based on a dog sniff—was not available to him.

///

The Court is further persuaded that the inventory search was pretextual because of what is missing from the objective evidence. For example, Sergeant English's police report is full of details like those described above (another example is that Turnbow was sweating when Sergeant English pulled him over), which appear to be written to establish reasonable suspicion or probable cause of drug-related activity. Notably absent from Sergeant English's police report is any discussion of his purported community caretaking motivations for the inventory search, such as concern about vandalism, or that the Car was not in a valid parking spot. (ECF No. 50-4 at 10-11.) As Sergeant English prepared the police report soon after Turnbow's arrest, the Court infers he would have noted his community caretaking concerns in the report if those concerns were really motivating him at the time of the search. Further, the Policy provides that a "Vehicle Inventory Report form shall be completed for vehicles impounded after arrest." (ECF No. 50-3 at 4 (internal quotation marks omitted).) But the government has proffered no Vehicle Inventory Report. That raises the possibility that it was not prepared at all, suggesting that Sergeant English did not really consider the search an inventory search at the time he conducted it. The absence of any discussion of the community caretaking reasons for the inventory search in the police report, and the absence of the applicable Vehicle Inventory Report, both suggest that Sergeant English's true motivation here was to find the drugs he believed were in the Car.

In addition, setting aside the missing Vehicle Inventory Report for a moment, Sergeant English's otherwise Policy-compliant decision to impound the Car also contains indicia that his motivation for invoking the inventory search exception was to search the Car for drugs. On the one hand, the Policy permitted Sergeant English to impound the Car because Method did not have a valid driver's license, and the Car was parked in the parking lot of the smoke shop, which is neither Turnbow's private or business property. (ECF No. 50-3 at 4.) On the other hand, the Policy gave Sergeant English discretion to

///

///

deal with the Car—other than by impounding it—that he did not exercise.[13] (*Id.*) Sergeant English knew that Method was a registered owner of the Car. Even though she lacked a valid license, he still could have left the car in her custody, and she could have arranged for a tow truck or a friend to transport it back to her house. At the very least, he could have asked her if she wanted that option. Sergeant English testified at the Hearing that the community caretaking concerns that led him to impound the Car were his concerns that the Car would be vandalized if left in the parking lot of the smoke shop, and that SPD would then be liable for the stolen contents of the Car. But leaving the Car with Method, particularly in the absence of any public safety concerns, would have mitigated both the vandalism and the liability concern. She would have been responsible for the Car and its contents. Thus, the fact that Sergeant English does not appear to have considered this reasonable alternative approach—permissible under the Policy—also weighs in favor of the Court finding that his true motivation was to search the Car for drugs without a warrant.

Sergeant English's testimony at the Hearing also undermines any purported community caretaking justification for the inventory search of the Car. Sergeant English testified that it was daylight, and the smoke shop was not in a particularly high crime area. This testimony suggests that his vandalism concern was not well founded. Further, Sergeant English also testified—even while on re-cross by the government—that the Car was not really impeding traffic where it was parked following the warrant stop. Based on the testimony given at the Hearing, the Court finds that while the Car was not in a parking spot, it was not blocking the drive-through of the smoke shop, or any road. Certainly, the community caretaking interest supporting impounding the Car because it was impeding the flow of traffic is much less strong here than in *Johnson*, where the car was blocking

---

[13]The Court acknowledges, and agrees to a point with, the government's argument that nothing in the Policy or the Fourth Amendment required Sergeant English to exhaust all alternatives before deciding to impound the car. But because Sergeant English testified he was motivated to impound the car to prevent anything inside the car from being stolen, and was concerned about SPD's liability if something was stolen, it would have been reasonable for him to consider alternatives to impoundment here because, as explained above, they would have mitigated his stated concerns.

traffic—and there, the Ninth Circuit still found defendant's motion to suppress should have been granted. *See Johnson*, 889 F.3d at 1123. That said, of course, Turnbow had been arrested, Method had an invalid license, and Sergeant English reasonably testified at the Hearing that he does not normally allow for third parties to pick up a car he would otherwise impound because it is inefficient and may introduce danger into the situation. But overall, the community caretaking interests at play here—even by Sergeant English's own admission—were not particularly strong. Again, the Policy allowed for Sergeant English to exercise his discretion to not impound the Car under the circumstances here, and the objective evidence supports a finding that Sergeant English exercised his discretion without sufficiently considering or offering a less intrusive option than impoundment because of his suspicion that the Car contained evidence of drugs.

For all of these reasons, the Court finds that the inventory search of the Car violated the Fourth Amendment. "As explained above, the purpose of such a search must be unrelated to criminal investigation; it must function instead to secure and to protect an arrestee's property (and likewise to protect the police department against fraudulent claims of lost or stolen property)." *Johnson*, 889 F.3d at 1128. The objective evidence before the Court shows that the purpose of Sergeant English's inventory search was to look for the drugs he thought might be in the Car, not to secure and protect Turnbow or Method's property. Thus, the inventory search was unconstitutional.

Under the fruits of the poisonous tree doctrine, the evidence obtained subsequent to this Fourth Amendment violation—all evidence located in the Car pursuant to the inventory search—is therefore inadmissible. *See United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) ("It is well established that, under the fruits of the poisonous tree doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible . . . unless the evidence obtained was purged of the primary taint.") (internal quotation marks omitted); *see also United States v. Patzer*, 277 F.3d 1080, 1086 (9th Cir. 2002) ("It is the government's burden to show that evidence is

///

14

not 'fruit of the poisonous tree.'") And here, there is no argument or evidence before the Court that the fruits of the warrantless inventory search have been purged of their taint.

## IV. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of Turnbow's Motion.

It is therefore ordered that Turnbow's motion to suppress (ECF No. 48) is granted. The fruits of the inventory search of the brown Honda are suppressed.

It is further ordered that, in light of the Court having previously granted Method's Joinder (ECF No. 49), the fruits of the inventory search of the brown Honda are also suppressed as to Method.

DATED this 14th day of February 2019.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE